UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARY A. ROCKETT, | ) | Civil No. 10-0163-DMS(WVG) |
| | ) | |
| Plaintiff, | ) | REPORT AND RECOMMENDATION: |
| | ) | |
| v. | ) | DENYING PLAINTIFF'S MOTION FOR |
| | ) | SUMMARY JUDGMENT (DOC. # 23) |
| MICHAEL J. ASTRUE, | ) | |
| | ) | GRANTING DEFENDANT'S MOTION |
| Respondent. | ) | FOR SUMMARY JUDGMENT |
| | ) | (DOC. # 25) |
| _____ | ) | |

I

INTRODUCTION

Plaintiff Mary A. Rockett (hereinafter "Plaintiff"), filed a Complaint for Judicial Review and Remedy On Administrative Decision Under the Social Security Act [42 U.S.C. §405(g)]. Defendant Michael J. Astrue (hereinafter "Defendant"), filed an Answer to the Complaint and the administrative record pertaining to this case. Plaintiff has filed a Motion for Summary Judgement. Defendant has filed an Opposition to Plaintiff's Motion for Summary Judgment and a Cross-Motion for Summary Judgment.

10cv0163

1    The Court, having reviewed Plaintiff's Motion for Summary

2   Judgment, Defendant's Opposition to Plaintiff's Motion for Summary

3   Judgment, Defendant's Cross-Motion for Summary Judgment, the

4   supplemental briefing by both parties, and the administrative record

5   filed by Defendant, hereby finds that Plaintiff is not entitled to

6   the relief requested and therefore RECOMMENDS that Plaintiff's

7   Motion for Summary Judgement be DENIED and Defendant's Motion for

8   Summary Judgment be GRANTED.

9                                    II

10                        PROCEDURAL HISTORY

11    Plaintiff filed concurrent applications for benefits based on

12   disability in July 2001. On August 9, 2002, the Honorable Peter J.

13   Valentino, Administrative Law Judge, denied Plaintiff's application.

14   On February 22, 2005, Plaintiff filed subsequent applications. On

15   June 24, 2005, Plaintiff's applications were denied. Plaintiff did

16   not appeal. (Administrative Record [hereinafter "AR"] at 11).

17    In this case, on March 27, 2007, Plaintiff filed applications

18   for Supplemental Security Income benefits and Disability Insurance

19   Benefits, alleging that she had been disabled since January 31,

20   2007. (AR at 116-122). The Commissioner of Social Security denied

21   her application initially and upon reconsideration. (AR at 67-71,

22   77-81). On June 9, 2009, a hearing was held at which Plaintiff

23   appeared with counsel and testified before the Honorable Larry B.

24   Parker, Administrative Law Judge (hereinafter "the ALJ"). (AR at 18-

25   50). On June 30, 2009, the ALJ found that Plaintiff was not

26   disabled. (AR at 10-17). On July 13, 2009, Plaintiff's attorney

27   filed a Request for Review of Hearing Decision. On November 20,

28   2009, the ALJ's decision became the final decision of the Commis-

10cv0163

1  sioner of Social Security when the Appeals Council denied Plain-

2  tiff's request for review. (AR at 1-3).

3      On January 20, 2010, Plaintiff filed her Complaint for

4  Judicial Remedy and Review on Administrative Decision (hereinafter

5  "Complaint"). On January 28, 2010, Plaintiff filed a supplemental

6  document with additional evidence. On September 9, 2010, Plaintiff

7  moved for Entry of Default. On September 14, 2010, the District

8  Judge assigned to this case denied the Motion, noting that Plaintiff

9  had not completed service upon Defendant. On September 21, 2010,

10  Plaintiff filed a Declaration of Service.[1] On November 19, 2010,

11  Defendant filed an Answer to the Complaint (hereinafter "Answer")

12  and the administrative record.

13      On December 29, 2010, Plaintiff filed a Motion for Summary

14  Judgment. On February 4, 2011, Defendant filed an Opposition to

15  Plaintiff's Motion for Summary Judgment and a Cross-Motion for

16  Summary Judgment (hereinafter "Defendant's Opposition"). On March 4,

17  2011, Plaintiff filed an Opposition to Defendant's Motion for

18  Summary Judgment. On June 1, 2011, Plaintiff filed additional

19  evidence.[2] On June 16, 2011, Defendant filed a Supplemental Brief

20  Addressing Additional Evidence Plaintiff Submitted to the Court,

21  arguing such additional evidence is irrelevant to the determination

22  of the issues before the court. On June 27, 2011, Plaintiff filed a

23  supplemental briefing and additional evidence.

24

25  [1]    The Declaration of Service omits the method used by Plaintiff to serve
Defendant and the date on which service was accomplished.

26

27  [2]    The additional evidence presented by Plaintiff primarily consists of medical
records dated after the ALJ's decision. These records post-date the decision and
concern, in large part, injuries relating to a October 14, 2009 motor vehicle
28  accident. The additional evidence is not relevant to a discussion of whether or
not the ALJ's determination was correct. Therefore, the Court will not address the
additional evidence.

10cv0163

III

STATEMENT OF FACTS

Plaintiff was born on July 30, 1957. (AR at 10, 25). She completed only the 9th grade[3] and in the last fifteen years, Plaintiff has worked as a security guard, an auto parts delivery driver, and has cared for her grandchildren. (AR at 10, 25, 29-33, 209, 219). She claims that she became unable to work on January 31, 2007 due to fibromyalgia, heart problems, back problems, asthma, migraines, dyslexia, stress, kidney problems, and blood in her stool. In addition, Plaintiff complains of depression and anxiety. (AR at 10, 27, 162). Plaintiff admits to working a limited number of days subsequent to her alleged onset date of January 31, 2007.[4] (AR at 150-155).

On March 27, 2007, a Disability Report regarding Plaintiff was completed by A. Villasenor. (AR 160). Villasenor apparently works for the Social Security Administration, although his or her exact capacity is unspecified. (See AR 156). Villasenor noted that, during the interview, Plaintiff did not display any difficulties, and was difficult to interview as she was rude, arrogant, and forgetful. (AR at 157-168).

On June 25, 2007, Plaintiff received a workers compensation settlement of $25,100, after other expenses. (AR at 43-44).

On September 24, 2007, Plaintiff completed a Function Report. She alleged that she could no longer cook, clean, play with her

---

[3]    In a Disability Report completed by Plaintiff, she contradictorily reported having completed the 12th grade. (AR at 167). At a psychiatric evaluation, she reported having completed only 10th grade. (AR at 266).

[4]    In a Disability Report completed by Plaintiff, she contradictorily reported that she did not work subsequent to her disability onset of January 31, 2007. (AR at 162).

10cv0163

1  grandchildren, drive for a long time, or work her job. She also

2  alleged that she could not sleep, raise her arm above her head, or

3  dress herself.[5/] She further alleged that she needed reminders to

4  bathe, among other functional limitations. (AR at 201-207).

5  A. <u>PHYSICAL MEDICAL HISTORY</u>

6        1. <u>DR. RICHARD SCOTT CAMPBELL, TREATING PHYSICIAN</u>

7        Plaintiff initially visited Sharp Medical Group in November

8  2006 due to an alleged back injury resulting from lifting a 40-50

9  pound box at work on November 26, 2006. (AR at 228)

10       On this date, Plaintiff had "plain film radiographs" taken of

11  her lumbar spine. Five views of the lumbar spine showed no fracture

12  or subluxation[6/] and that Plaintiff's intervertebral disk spaces were

13  preserved. The results were deemed "negative examination" as read by

14  Dr. Peter Yang. (AR at 235).

15       Since this alleged injury, Plaintiff reported that she has

16  experienced constant pain in her lower back, radiating to her

17  buttocks. (AR at 228). Plaintiff received prescriptions for Vicodin

18  and Flexeril and was advised to follow up with Occupational Health

19  Services. (AR at 229).

20       On November 28, 2006, Plaintiff followed up with Occupational

21  Health Services. Dr. Campbell first evaluated Plaintiff on this

22  date. Plaintiff reported to Dr. Campbell that she had hurt her back

23  at work lifting a tub filled with parts. Plaintiff described the

24  pain as increasing, that she had pain to her left buttocks, and

25

---

26  [5/]    Plaintiff claims she cannot raise her arm over her head or neck to comb her
hair. Although she does not specify which arm she is referring, it is probably,
27  given the context, that Plaintiff's claim is that she cannot so raise either of
her arms.

28  [6/]    Subluxation is an "incomplete luxation or dislocation; though a relationship
is altered, contact between joint surfaces remains." Stedman's Medical Dictionary,
27th Ed. (2000).

10cv0163

numbness going down the left leg to her foot. (AR at 229). Dr. Campbell examined Plaintiff and diagnosed her with lumbar strain, thoracic strain, and left-sided sciatica. She was given prescriptions for ibuprofen, Myoflex Creme, Vicodin ES, and Valium.[7] Plaintiff was also given an injection of Toradol.[8] (AR at 229-230).

Plaintiff subsequently was seen by the Physician's Assistant at Sharp Medical Group. Plaintiff reported that her pain had not gotten better and that she now had numbness in her feet and shooting pain down her right leg. Plaintiff requested refills of her medication. (AR at 230).

On January 2, 2007, Dr. Campbell re-evaluated Plaintiff. Plaintiff reported that her pain seemed to be decreasing, although after intercourse her pain increased significantly. (AR at 230). Plaintiff complained of bilateral radiculopathy[9], described as numbness, pain, and tingling. The examination showed that Plaintiff had significant difficulty moving around. Plaintiff was to continue with physical therapy, and continue using her ibuprofen, Vicodin, and Valium. Plaintiff also received an injection of Toradol. (AR at 230).

On January 16, 2007, Plaintiff was seen again by Dr. Campbell. Plaintiff reported that she was doing slightly better and that her physical therapy was helping, although she was still taking the Vicodin and Valium periodically and her pain level was still quite high. Plaintiff's examination was unchanged and she was to

---

[7]    Myoflex Creme is an anti-inflammatory drug. See http://www.drugs.com/cdi/myoflex-cream.html

[8]    Toradol is a non-steroidal anti-inflammatory drug used to treat mild to moderate pain. See Kristyn S. Appleby and Joanne Tarver, Medical Records Review, § 5.7 Medications, t.5-2.

[9]    Radiculopathy is a "disorder of the spinal nerve roots." Stedman's Medical Dictionary, 27th Ed. (2000).

10cv0163

continue with physical therapy. Plaintiff was referred for an MRI as her symptoms indicated a possible herniated disc. She was given a refill of Vicodin, Valium, and ThermaCare Patches. (AR at 231).

On January 30, 2007, Plaintiff reported that her pain had increased, which Dr. Campbell thought was odd since she had previously reported her pain was ten on a scale of one to ten.[10/] Plaintiff stated that she hurt her back significantly at work lifting a 25 pound box and that the lifting and driving requirements of her job aggravated her back pain. Plaintiff's diagnosis was modified to lumbar strain with probable herniated nucleus pulposus, thoracic strain, and bilateral radiculopathy.[11/] (AR at 231).

On February 9, 2007, Plaintiff had an MRI of her lumbar spine. Findings indicated (1) focal central disk protrusion at L4-5 measuring up to 5MM, (2) no central spinal stenosis[12/], and (3) mild bilateral neural foraminal narrowing[13/] at L4-4 and L5-S1 as read by Baseer Khan, M.I. (AR at 235).

On February 16, 2007, Plaintiff reported that she was doing worse, despite having not worked for several days after being sent home by her employer. Plaintiff stated that the last day she worked, she lifted a 40 pound box, possibly explaining the increase in her pain level. (AR at 231).

---

[10/]    A ten would indicate the highest level of pain.

[11/]    "Herniated nucleus pulposus" refers to a torn or damaged pulpy center (as in the center of the discs of the spinal cord). See Stedman's Medical Dictionary, 27th Ed. (2000) (entries for "nucleus pulposus"). "Thoracic strain" refers to a strain of the upper part of the trunk, between the neck and abdomen. Id. (entries for "thorax").

[12/]    Stenosis is a "stricture of any canal or orifice." Stedman's Medical Dictionary, 27th Ed. (2000).

[13/]    "Bilateral neural foraminal narrowing" refers to a narrowing of the natural openings in the spine that allow the spinal cord to pass through.

10cv0163

On March 6, 2007, Plaintiff reported that she was doing a little better and that she had been seen by Dr. John Serocki, an orthopedic surgeon. Dr. Campbell spoke with Dr. Serocki, who informed him that he did not feel as if Plaintiff were a candidate for surgery or that corticosteroid injections would be helpful. Plaintiff's diagnosis was modified lumbar strain, thoracic strain, bilateral radiculopathy, L4-5 central disk protrusion of 5mm, and L4-5 neural foraminal narrowing. Plaintiff was sent back to work on a modified status. (AR at 232).

On March 19, 2007, it was noted that Plaintiff had been complaining of neck discomfort. Plaintiff was working as a cashier, was not doing any heavy lifting, and was tolerating this work well.(AR at 232).

On April 3, 2007, Plaintiff reported an increase in pain and was upset because her chair was taken away at work, which was helping her to be more comfortable at the register. Plaintiff complained of more numbness in her foot and asked for temporary totally disabled status but was refused. (AR at 232).

On April 10, 2007, Plaintiff had her permanent and stationary evaluation. Plaintiff reported stabbing pain in her mid-lumbar region. Plaintiff also complained of an inability to turn in bed and continued leg numbness, pain, and tingling. She alleged that when her back symptoms flare up, her leg symptoms do as well. Plaintiff claimed that she occasionally lost her balance and had some tripping and that her neck pain had begun with her initial injury. (AR at 232-233).

1    Plaintiff claimed to have been diagnosed with fibromyalgia
2    years earlier, initially causing pain in her hands and feet, and now
3    pain in her arms and hands.[14] (AR at 233).

4    Plaintiff complained that she was having difficulty with
5    multiple activities, including (1) intercourse, (2) walking long
6    distances, (3) sitting for a long time, (4) cooking, (5) cleaning,
7    and (6) using stairs. Plaintiff alleged that she cannot even lift a
8    gallon of milk. (AR at 233-234).

9    Dr. Campbell found that Plaintiff was alert, was in no
10   apparent distress, but did appear to be sitting uncomfortably on the
11   examination table. Plaintiff moved around uncomfortably and had
12   difficulty lying down and getting up from a lying position. (AR at
13   233).

14   Examination of Plaintiff's back showed no obvious abnormali-
15   ties or deformities, but did reveal some tenderness to palpation at
16   various points. Plaintiff's grip strength measured 0/0/0 on both
17   hands, although she reported no pain in her hands that day. (AR
18   at 234). Dr. Campbell noted that Plaintiff got up from the examina-
19   tion table slowly and that her gait is slightly antalgic.[15]

20   Dr. Campbell opined that Plaintiff's condition had reached
21   permanent and stationary status because her symptoms had essentially
22   remained unchanged and she had achieved maximum medical improvement.
23   (AR at 237). Furthermore, he believed Plaintiff required work
24   restrictions in the open labor market as she could not sit for
25   longer than one hour, stand for longer than one hour, walk for

26   _____

27   [14]   Fibromyalgia is "a syndrome of chronic pain of musculoskeletal origin but
uncertain cause." Stedman's Medical Dictionary, 27th Ed. (2000).

28   [15]   Antalgic gait is "a characteristic gait resulting from pain on weightbearing
[leg] in which the stance phase of gait is shortened on the affected side."
Stedman's Medical Dictionary, 27th Ed. (2000).

10cv0163

longer than one hour, bend or twist repeatedly, lift more than 20 pounds, or push and pull more than 25 pounds. (AR at 238).

2. ADAM IANNAZZO, M.P.T.

On March 23, 2007, Adam Iannazzo performed a Functional Capacity Examination on Plaintiff. Mr. Iannazzo's evaluation aimed to determine whether Plaintiff could meet the essential job requirements of a delivery driver. (AR at 235). However, the examination requested was a "fitness for duty" examination and was not as thorough as Mr. Iannozzo would have done for a Functional Capacity Examination. (AR at 235)

Mr. Iannazzo found that Plaintiff's behavior reflected pain, but felt she was giving sub-maximal and inconsistent effort. Therefore, he was unable to determine her abilities. He did note that Plaintiff was capable of walking without restriction, that she was unable to squat, that she was able to stand for one hour during the examination, and that she was able to lift a seven and one half pound box, but could not lift a 10 pound box. However, she was able to *carry* a 10 pound box 30 feet. Furthermore, Plaintiff was able to carry 15 pounds but reported lower back pain upon doing so and seemed to have "maxed out." (AR at 235).

Mr. Iannazzo noted several inconsistencies between Plaintiff's testing results and her reported abilities.[16] (AR at 235-236). He concluded that "[t]he detailed inconsistencies above show

---

[16]     For example, Mr. Iannazzo states "Plaintiff was unable to transfer self without antalgia [antalgic gait] into a supine from sitting position, but able to lift both legs without issue when placing bolster under legs...Grip strength is so low that [Petitioner] would be essentially nonfunctional without documented wrist or hand pathology. [Petitioner able to drive with extremely high pain report. Finally, in regard to driving, [Plaintiff] would be a danger to self and others if cervical and lumbar active range of motion was actually this restricted since she is driving such a large vehicle. When stepping down from her truck, this is at least a 21-inch rise from the ground to the step, but the patient reports that she is unable to do a 7-inch step for stairs. [Petitioner] entered her truck without antalgia at the end of the examination. This is observed from directly from the window of the clinic that overlooks the parking lot." (AR at 236).

                                                                    10cv0163

1    that this client is fabricating her symptoms and lifting impairment

2    for secondary gains and magnifying her symptoms so as to remain out

3    of work, and further medical intervention should be based solely on

4    scientific objective findings since subjective reports are not

5    trustworthy or accurate of the client's actual pain or ability." (AR

6    at 236).

7         3. DR. G.G. SPELLMAN

8         On June 1, 2007, Dr. Spellman performed a Physical Residual

9    Functional Capacity Assessment (hereinafter "RFC") with regard to

10   Plaintiff. Dr. Spellman opined that Plaintiff could (1) occasionally

11   lift/carry twenty pounds, (2) frequently lift/carry ten pounds, (3)

12   stand for six hours of an eight hour work day, (4) sit for six hours

13   of an eight hour work day, and (5) conduct unlimited pushing or

14   pulling (including hand/foot controls). (AR at 242). Additionally,

15   she could occasionally balance, stoop, kneel, crouch, crawl, and

16   climb, but not on ladders. (AR at 243).

17        4. DR. STEVEN GOODMAN

18        On July 4, 2007, Plaintiff was admitted to an emergency room

19   with a left-side migraine and was treated by Dr. Goodman. Her

20   migraine was characterized with sensitivity to light, extreme

21   nausea, and several episodes of vomiting. Dr. Goodman reported that

22   these symptoms are "pretty typical" of Plaintiff's migraines,

23   although "[p]ossibly a little bit more severe than usual." Plaintiff

24   had been outside on a hot day for a significant period of time when

25   the migraine began. Plaintiff reported being completely pain-free an

26

27

28

10cv0163

hour after being given 2mg of Dilaudid and 12.5mg of Phenergan intravenously.[17/] (AR at 301).

### 5. JULY 24, 2008 EMERGENCY ROOM VISIT

On July 24, 2008, Plaintiff took a bus to the UCSD Medical Center and was admitted to the emergency room for shoulder pain. The triage nurse recorded that Plaintiff's pain was dull and began in her right shoulder before radiating to her arm.[18/] Plaintiff reported a pain level of ten out of ten, that the pain was not caused by a work or domestic violence related injury, and that the pain had existed for about three weeks. The treating physician, Dr. Angela Pham, reported being unable to fully assess Plaintiff's shoulder due to pain. Plaintiff was given prescriptions for Vicodin and Motrin. Upon discharge, she reported a pain level of two out of ten. (AR at 377-79, 387).

### 6. JULY 24, 2008 X-RAYS

On July 24, 2008, Dawn Engelkemier and John Stassen reviewed x-rays taken of Plaintiff's right shoulder.[19/] They found normal bone alignment, no evidence of acute fracture, and nothing remarkable about Plaintiff's soft tissues. (AR at 385).

On the same day, Engelkemier and Stassen reviewed x-rays taken of Plaintiff's cervical spine. They found no evidence of acute fracture, dislocation, or misalignment. However, they found

---

[17/]   Diluadid is an opiate analgesic, typically prescribed for therapeutic pain relief. See Physicians Desk Reference (2005) (available at 2005 WL 4060823). Phenergan is an antihistamine, typically prescribed to treat allergy symptoms. See http://en.wikipedia.org/wiki/Phenergan; see also Wyeth v. Levine, 555 U.S. 555 (2009) ("Phenergan is Wyeth's brand name for promethazine hydrochloride, an antihistamine used to treat nausea.").

[18/]   Although the record states the pain begin in Plaintiff's right shoulder, it does not state which arm the pain radiated into.

[19/]   It is unclear when these x-rays were taken. Given the similarities as to date, time, and issue, the Court will assume that the x-rays were taken during Plaintiff's emergency room visit that occurred on the same day.

10cv0163

1    "significant degenerative disc disease at C5-C6" and noted that

2    "[g]iven the severity of the disease at this single level, it is

3    likely secondary to prior trauma or prior infection." (AR at 386).

4           7. <u>FEBRUARY 7, 2009 EMERGENCY ROOM VISIT</u>

5           On February 7, 2009, Plaintiff took a bus to the UCSD Medical

6    Center for an MRI and a medication refill. While at the hospital,

7    she was admitted to the emergency room at the UCSD Medical Center

8    due to leg pain. The triage nurse recorded that Plaintiff's pain was

9    constant and began in her left buttock before radiating to her left

10   leg. Plaintiff reported a pain level of nine out of ten and that the

11   pain was not caused by a work or domestic violence related injury.

12   She was prescribed four medications. However, these medications are

13   not identified in the record. Plaintiff was accompanied by two

14   grandsons and identified herself as their primary caregiver. Upon

15   discharge, she reported a pain level of three out of ten. (AR at

16   377-79, 387).

17          8. <u>DR. MICHAEL SCOTT JAFFE</u>

18          On April 14, 2009, Plaintiff visited Dr. Jaffe, who special-

19   izes in osteopathic medicine. Her chief complaint was pain in her

20   neck, right shoulder, and right arm. Dr. Jaffe diagnosed myofascial

21   pain syndrome, carpal tunnel syndrome, and chronic pain syndrome.[20]

22   He prescribed Lidocaine in 700mg topical patches.[21] Dr. Jaffe also

23   ordered an MRI of Plaintiff's cervical spine and instructed

24

25

26

27   _____

     [20]   Myofascial pain syndrome refers to pain in the fibrous tissue separating
28   muscles from each other and from the skin. <u>See</u> Stedman's Medical Dictionary, 27th
     Ed. (2000) (entries for "myofascial" and "fascia").

     [21]   Lidocaine is a local anaesthetic. Stedman's Medical Dictionary, 27th Ed.

                                          13                          10cv0163

1  Plaintiff to call him two days after the MRI to review the results.

2  (AR at 343-45).[22/]

3       Dr. Jaffe noted that Plaintiff was alert, had normal

4  sensation, normal strength, and normal reflexes. However, he also

5  noted that Plaintiff had "[g]reater than 11/18 tender points of

6  Fibromyalgia syndrome" with "no active synovitis".[23/] (AR at 346).

7  The nursing notes for this visit listed 40 prescribed medications.

8  (AR at 347-51).

9       9. DR. JAFFREY

10       On April 14, 2009 (the same day that Plaintiff visited Dr.

11  Jaffe), Dr. Jaffrey completed a "Physical Capacities Evaluation"

12  regarding Plaintiff.[24/] This evaluation indicated that she could sit,

13  stand, or walk for zero hours at a time. Somewhat inconsistently,

14  Dr. Jaffrey reported that, out of an eight-hour workday, Plaintiff

15  was able to sit for two hours, stand for one hour, and walk for one

16  hour. (AR at 334).

17       In terms of lifting ability, Dr. Jaffrey indicated that

18  Plaintiff could occasionally lift 6-10 or 11-20 pounds but never

19  greater than 21 pounds. Dr. Jaffrey did not mark a box for the 0-5

20  pounds category. (Id.).

21

22

23  [22/]   On April 30, 2009, an MRI of Plaintiff's cervical spine was performed by Dr. Glenn H. Tsukada. He found "mild spinal stenosis" and "moderate ... foraminal narrowing." (AR at 355-56). On February 7, 2009, an MRI of Plaintiff's lumbar

24  spine was performed by Dr. Jon M. Robins. He found a "[s]mall midline disc protrusion with annular fissure. No compromise of the central canal or foramina." (AR at 376). An annular fissure is a ring-shaped fissure. See Stedman's Medical

25  Dictionary, 27th Ed. (2000).

26  [23/]   Synovitis is an inflammation of the fluid-containing membranes of a joint. It is often associated with or used to refer synonymously to arthritis. See

27  Stedman's Medical Dictionary, 27th Ed. (2000) (entries for "synovitis" and "synovial fluid").

28  [24/]   The name "Dr. Jaffrey" has been written underneath the signature line on the pages of this assessment. (See AR at 330, 332). The same name is typed on one page. (See AR at 333). It is likely that Dr. Jaffrey is actually Dr. Jaffe.

10cv0163

1    In terms of carrying ability, Dr. Jaffrey indicated that
2   Plaintiff could occasionally carry 6-10 pounds but never greater
3   than 21 pounds. Dr. Jaffrey did not mark a box for the 0-5 or 11-20
4   pound categories. (Id.).

5    In terms of using her hands, Dr. Jaffrey indicated that
6   Plaintiff could not push or pull arm controls but that should could
7   engage in fine manual manipulation. Dr. Jaffrey did not mark a box
8   for the "simple grasping" category. (Id.).

9    However, on the same day, Dr. Jaffrey completed a one-page
10   form that stated a diagnosis of "Chronic Pain Syndrome". Dr. Jaffrey
11   noted that Plaintiff could occasionally engage in fine or gross
12   manipulative activities with her hands and could rarely engage in
13   "pushing/pulling activities". (AR at 333).

14    Dr. Jaffrey indicated that Plaintiff could occasionally bend,
15   squat, or reach but could not crawl or climb. Additionally, Dr.
16   Jaffrey indicated that Plaintiff was totally restricted from
17   activities involving unprotected heights, driving automotive
18   equipment, and exposure to dust, fumes, and gases. (AR at 334).

19    10. DR. ERWIN GUZMAN

20    Two days later, on April 16, 2009, Plaintiff saw Dr. Guzman.
21   He diagnosed her with asthma, myofascial pain syndrome, and carpal
22   tunnel syndrome. Plaintiff requested that Dr. Guzman fit her with
23   wrist splints. He prescribed Qvar in an inhaler, albuterol in an
24   inhaler, and nortriptyline in 10mg doses.[25] Dr. Guzman also ordered
25   x-rays of Plaintiff's knees and ankles. (AR at 353).

26

27

28   [25] Qvar and albuterol are anti-inflammatory drugs typically prescribed to treat
the symptoms of asthma. See Physicians Desk Reference (2005) (available at 2005
WL 4061219); see also Stedman's Medical Dictionary, 27th Ed. (2000). Nortriptyline
is an antidepressant. Id.

10cv0163

1       On April 29, 2009, Plaintiff saw Dr. Guzman about her knee

2   pain. He prescribed Tramadol in 50mg oral tablets.[26] At this time,

3   Plaintiff was already taking the following pain and depression

4   medications: 1) nortriptyline in 10mg capsules, 2) Lipoderm in 700mg

5   patches, 3) hydrocodone-acetaminophen in 500mg oral tablets, 4)

6   carisoprodol in 350mg oral tablets, 5) prednisone in 10mg oral

7   tablets, 6) Lexapro in 10mg oral tablets, 7) Trazadone in 100mg oral

8   tablets.[27] Plaintiff was also taking medications for a cough and for

9   asthma. (AR at 336-37). On April 29, 2009, Plaintiff was given a

10  knee brace. (AR at 367).

11      11. DR. SANDRA CHRISTIANSEN

12      On May 6, 2009, Dr. Christiansen described Plaintiff's asthma

13  and rhinitis in a letter addressed "[t]o whom it may concern". In

14  this letter, Dr. Christiansen stated that Plaintiff's respiratory

15  tract problems were "poorly controlled" and that her exercise was

16  therefore "limited". (AR at 375).

17      12. NORM HARDMAN, THERAPY SPECIALIST

18      On June 3, 2009, Plaintiff saw Norm Hardman, a therapy

19  specialist. Plaintiff reported the following limitations: 1) ability

20  to sit limited to less than 30 minutes, 2) ability to walk limited

21  to less than 15 minutes, 3) inability to bend without pain. Mr.

22  Hardman recommended physical therapy twice a week for three to four

23  weeks. (AR at 410).

24  B. PSYCHIATRIC MEDICAL HISTORY

25  _____

26  [26]   Tramadol is an analgesic drug, typically prescribed to treat moderate to severe pain. Stedman's Medical Dictionary, 27th Ed. (2000).

27  [27]   Hydrocodone-acetaminophen is the active ingredient in Vicodin. See http://en.wikipedia.org/wiki/Hydrocodone/acetaminophen.   Carisoprodol is a skeletal muscle relaxant with abuse potential. Stedman's Medical Dictionary, 27th Ed. (2000). Prednisone is an anti-inflammatory drug. Id. Lexapro and Trazadone are antidepressant drugs.   See http://en.wikipedia.org/wiki/Lexapro;   see http://en.wikipedia.org/wiki/Trazadone.

10cv0163

1   1. <u>DR. MOUNIR SOLIMAN</u>

2   On July 28, 2007, Dr. Soliman conducted a "Complete Psychiat-

3   ric Evaluation" of Plaintiff at the request of the Department of

4   Social Services. Dr. Soliman noted Plaintiff brought herself to the

5   clinic by public transit and that her gait was normal. Plaintiff

6   reported using the public transit for her transportation needs.

7   Plaintiff complained of depression; "[d]espite medication, Plaintiff

8   report[ed] sadness, decreased energy and decreased concentration, as

9   well as anxiety and irritability." She alleged that she was unable

10  to work as a result of her physical and psychiatric condition.

11  However, she reported being able to cook, clean, shop, run errands,

12  attend to her personal hygiene, and manage her finances. (AR at 266)

13  At the evaluation, Plaintiff's immediate, recent, and remote

14  memory was tested and found intact. Specifically, she was oriented

15  to person, place, and time, she correctly recalled three of three

16  objects after five minutes, and was able to perform serial sevens

17  without errors.[28]/ Plaintiff's abstract thinking was normal, her

18  insight and judgment were good, and her reality associations were

19  not loose. However, she did report auditory hallucinations.

20  Furthermore, Plaintiff's mood and affect were depressed. (AR at 266-

21  67).

22  In terms of work, Dr. Soliman determined that Plaintiff was

23  able to comprehend, remember, and carry out instructions. She could

24  withstand the stress of a normal eight-hour workday on a day-to-day

25  basis. (AR at 268).

26

27

28  [28]/   Serial sevens are a diagnostic test in which the patient performs serial substraction of sevens from one hundred. It is often used to assess mental status. <u>See</u> http://en.wikipedia.org/wiki/Serial_sevens; <u>see also</u> 20 C.F.R. 404, Subpt. P, App. 1, 12.00.

10cv0163

On August 3, 2007, Dr. K.J. Loomis summarized the evidence in Plaintiff's file, including Dr. Soliman's evaluation, and completed a Mental Residual Functional Capacity Assessment (hereinafter "First MRFC"). Dr. Loomis found no significant limitations on Plaintiff's mental capacity except as to the "ability to understand and remember detailed instructions" and "ability to carry out detailed instructions" categories. In these two categories, Dr. Loomis noted that Plaintiff's capacity was "moderately limited." (AR at 280, 282).

### 2. DR. JAFFREY

On the same day (April 14, 2009) that Plaintiff visited Dr. Jaffe, a second Mental Residual Functional Capacity Assessment (hereinafter "Second MRFC") was written by Dr. Jaffrey.[29] Like the First MRFC, the Second MRFC summarized evidence in Plaintiff's file. The Second MRFC indicates that Plaintiff was moderately limited in ten categories, including "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" and "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." (AR at 330-31).

Furthermore, Dr. Jaffrey indicated in the Second MRFC that Plaintiff was "markedly limited" in "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." Unlike Dr. Loomis' assessment in the First MRFC, Dr. Jaffrey did not complete the

---

[29]    As noted supra, it is likely that Dr. Jaffrey is likely the same doctor as Dr. Jaffe. If they are the same physician, it is unclear what expertise Dr. Jaffe, an osteopathic doctor, has in psychiatry. The paperwork signed by Dr. Jaffrey does not list an associated clinic or hospital.

10cv0163

narrative section entitled "Functional Capacity Assessment". (AR at 331-32).

### 3. THIRD MRFC

On May 6, 2009, a third Mental Residual Functional Capacity Assessment (hereinafter "Third MRFC") was written by a therapist whose signature is illegible. The Third MRFC was based on observations made at two appointments; April 30, 2009 and May 6, 2009. The Third MRFC indicates that Plaintiff was moderately limited in ten categories and markedly limited in four categories. Of the twenty categories, the Third MRFC matches the First MRFC in seven categories and the Second MRFC in six categories. Although the Third MRFC was 21 months after the First MRFC, it was less than 1 month after the Second MRFC. (AR at 397-98; see also AR at 280-82, 330-32).

### 4. DR. SAMUEL ETCHIE

On May 18, 2009, Dr. Etchie confirmed Plaintiff's diagnosis of Major Depressive Disorder with Anxiety Features in a letter addressed "To Whom It May Concern". In this letter, Dr. Etchie noted that Plaintiff had been prescribed Lexapro, Trazadone, and Buspar for daily use.[30] (AR at 399).

### IV

### SUMMARY OF APPLICABLE LAW

Title II of the Social Security Act (hereinafter "Act"), as amended, provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from physical or mental disability. 42 U.S.C. § 423(a)(1)(D). Title XVI of the Act provides for the payment of disability benefits to indigent persons under the Supplemental Security Income (SSI) program. § 1382(a).

---

[30] Buspar is used to treat generalized anxiety disorders. See http://en.wikipedia.org/wiki/Buspar

10cv0163

Both titles for the Act define "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months..." <u>Id.</u> The Act further provides that an individual:

> ...shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. 42 U.S.C. § 423(d)(2)(a).

The Secretary of the Social Security Administration has established a five-step sequential evaluation process for determining whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920.

Step one determines whether the claimant is engaged in "substantial gainful activity." If he is, disability benefits are denied. 20 C.F.R. §§ 404.1520(b), 416.920(b). If he is not, the decision maker proceeds to step two.

Step two determines whether the claimant has a medically severe impairment or combination of impairments. That determination is governed by the "severity regulation". The severity regulation provides in relevant part:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience. §§ 404.1520(c), 416.920(c).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). Such abilities and aptitudes include "[p]hysica

20

10cv0163

functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "[c]apacities for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers, and usual work situations;" and "[d]ealing with changes in a routine work setting." Id. If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to step three.

Step three determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment meets of equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to step four.

Step four determines whether the impairment prevents the claimant from preforming work he has performed in the past. If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot perform his previous work, the evaluation proceeds to step five.

Step five, the final step of the process, determines whether he is able to perform other work in the national economy in view of his age, education, and work experience. The claimant is entitled to disability benefits only if he is not able to perform other work. [20 C.F.R. §§ 404.1520(f), 416.920(f)].

V

ALJ'S FINDINGS

The ALJ made the following pertinent findings:

21

10cv0163

1. [Plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2012.

2. [Plaintiff] has not engaged in substantial gainful activity since January 31, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. [Plaintiff] has the following severe impairments: degenerative disc disease of the cervical and lumbar spine, obesity, asthma, migraine headaches, an adjustment disorder and an anxiety disorder (20 CFR 404.1520(c) and 416.920©)).

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for any climbing of ladders, ropes or scaffolds and is limited to occasional climbing of ramps and stairs and occasional balancing, stooping, kneeling, crouching and crawling; and more than simple, repetitive tasks if she has minimal or no contact with the general public.

6. [Plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. [Plaintiff] was born on July 30, 1957 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. [Plaintiff] subsequently changed age category to closely approaching advanced age. (20 CFR 404.1563 and 416.963).

8. [Plaintiff] has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Plaintiff] is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform, including the following unskilled light occupations

with an SVP of 2[31]: inspector (DOT No. 5459.687-074) of which there are 8400 jobs in the regional economy and 140,000 in the national economy and hand packer (DOT No. 685.687-014) of which there are 3500 jobs in the regional economy and 680,000 jobs in the national economy. This finding, which is made within the framework of Medical-Vocational Rules 202.18 and 202.11 of Table No.2 of Appendix 2 to Subpart P of Regulations No. 4, is predicated on expert vocational testimony (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 31, 2007 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

VI

STANDARD OF REVIEW

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is defined as relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Mathews v. Shalala, 10 F.3d 678, 679 (9th Cir. 1993) ("Substantial evidence, considering the entire record, is relevant evidence which a reasonable person might accept as adequate to support a conclusion."). A reviewing court's role is not to determine whether the record can support the claimant's alternative view of the evidence, but whether substantial evidence supports the ALJ's conclusions. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

A district court may only disturb the Commissioner's final decision "if it is based on legal error or if the fact findings are

---

[31]/   SVP stands for Specific Vocational Preparation. An SVP of 2 indicates an unskilled task that requires less than 31 days of training. 20 C.F.R. § 656.3.

10cv0163

1   not supported by substantial evidence." Sprague v. Bowen, 812 F. 2d

2   1226, 1229 (9th Cir. 1987); see Villa v. Heckler, 797 F.2d 794, 796

3   (9th Cir. 1986). The court cannot affirm the Commissioner's final

4   decision simply by isolating a certain amount of supporting

5   evidence. Rather, the court must examine the administrative record

6   as a whole. Gonzalez v. Sullivan, 914 F.2d 1197, 1200 (9th Cir.

7   1990). However, the Commissioner's findings are not subject to

8   reversal simply because substantial evidence exists in the record to

9   support a different conclusion. See, e.g., Mullen v. Brown, 800 F.2d

10  535, 545 (6th Cir. 1986). The Commissioner's decision must be set

11  aside, even if supported by substantial evidence, if improper legal

12  standards were applied in reaching that decision. See, e.g., Benitez

13  v. Califano, 573 F.2d 653, 655 (9th Cir. 1978).

14                                 VII

15                             DISCUSSION

16       Plaintiff's Complaint argues that Plaintiff's "information

17  was not presented and the decision was unfair" and alleges that the

18  Defendants "didn't send me to there [sic] doctor at all...".

19  (Complaint at 1-2). Beyond these two contentions, the Complaint

20  appears to be a litany of Plaintiff's alleged medical conditions.

21  (See Complaint).

22       Plaintiff's Motion for Summary Judgment reiterates the

23  arguments made in the Complaint.[32/] However, Plaintiff attaches a

24  copy of her Request for Review of Hearing Decision letter, origi-

25  nally sent by her attorney to the Appeals Council. The request

26  letter alleged that the "ALJ's decision is not based on substantial

27

28  [32/]   In fact, Plaintiff's Motion for Summary Judgment appears to be a photocopy
         of her Complaint with the words "MOTION FOR SUMMAY [sic] JUDGMENT" added
         immediately after the caption and title.

1    evidence, and that [the ALJ] committed legal error." On November 20,

2    2009, the Appeals Council denied this request. The Court presumes

3    that Plaintiff intends the argument presented in the letter to apply

4    to the Motion for Summary Judgment now before the Court.

5         On this basis, Plaintiff appears to argue that the ALJ erred

6    in rejecting the opinions of treating physicians in favor of

7    opinions from one-time examiners and that the ALJ's decision was

8    therefore not based on substantial evidence.

9         Defendant argues that the ALJ's decision was supported by

10   substantial evidence, noting that Plaintiff's residual functional

11   capacity assessment found her able to "perform a range of simple,

12   repetitive light work..." Defendant notes that assessing residual

13   functional capacity is an administrative, rather than medical,

14   function and is the responsibility of the Commissioner. See 20

15   C.F.R. §§ 404.1427(e), 16.927(e)(2); see also Vertigan v. Halter,

16   260 F.3d 1044, 1049 (9th Cir. 2001) ("it is the responsibility of

17   the ALJ, not the claimant's physician, to determine residual

18   functional capacity.") Since the ALJ's decision was based on

19   substantial evidence, Defendant contends that the ALJ did not commit

20   legal error.

21

22        A. SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S DETERMINATIONS

23        Plaintiff argues that the ALJ erred in rejecting the opinions

24   of treating doctors in favor of opinions of one-time examiners. As

25   a matter of law, no error exists. ALJs are not required to give

26   controlling weight to a treating physician's opinion unless it is

27   well-supported and not inconsistent with other substantial evidence

28   in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("If we

     find that a treating source's opinion... is well supported... and

not inconsistent with the other substantial evidence... we will give it controlling weight."); <u>see also</u> <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1202-03 (9th Cir. 2001)

As explained in <u>Holohan</u>, "[a]n ALJ may reject the uncontra-dicted medical opinion of a treating physician only for 'clear and convincing' reasons supported by substantial evidence in the record." <u>Id.</u> at 1202 (internal quotation marks and citation omitted). Alternatively, "[a]n ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if she or he provides specific and legitimate reasons supported by substantial evidence in the record." <u>Id.</u> (internal quotation marks and citation omitted).

An ALJ may reject subjective accounts "upon (1) finding evidence of malingering, or (2) expressing clear and convincing reasons for doing so." <u>Benton v. Barnhart</u>, 331 F.3d 1030, 1040 (9th Cir. 2003). Dr. Campbell's report, summarized <u>supra</u>, is rife with evidence of such malingering.

Here, opinions by Plaintiff's treating doctors are contradic-tory. Even if they were not contradictory, the ALJ had clear and convincing reasons, supported by substantial evidence in the record, for not giving the treating doctors' opinions controlling weight.

A. DR. CAMPBELL

Dr. Campbell, a treating physician, reported that he believed Plaintiff was precluded from sitting, standing, or walking for greater than one hour at a time. Also, he reported that she could not do any repetitive bending or twisting and could not lift more than 20 pounds. (AR at 238). However, his opinion notes that Plaintiff had "four extremely positive Waddell tests for symptom magnification." (AR at 236) The opinion also quotes Mr. Iannazzo's

report of "inconsistencies... show[ing] that [Plaintiff] is fabricating her symptoms and lifting impairment for secondary gains, and magnifying her symptoms as to remain out of work... subjective reports are not trustworthy or accurate of [Plaintiff's] actual... ability." (Id.) Dr. Campbell concluded that Plaintiff's "subjective complaints have been out of proportion to physical examination findings, and functional capacity examination showed inconsistent and/or submaximal effort..." (AR at 237).

Dr. Campbell concludes that "[o]verall, [Plaintiff] is rated as having a 6 percent impairment of the whole person." (AR at 238). Although Dr. Campbell believed Plaintiff was precluded from standing, sitting, or walking for greater than one hour at a time, a second doctor who reviewed Dr. Campbell's report concluded otherwise. Dr. Spellman concluded that Plaintiff could sit or stand for six hours of an eight hour work day.

B. DR. JAFFE (JAFFREY)

On April 14, 2009, Plaintiff visited Dr. Jaffe, another treating doctor. There are also several records from a Dr. Jaffrey that are dated April 14, 2009. As noted supra, these appear to be the same doctor and will be so addressed by the Court.

The opinions signed by Drs. Jaffe and Jaffrey are also inconsistent and clearly controverted by other substantial evidence in the record. Dr. Jaffe, an osteopathic specialist, recommended that Plaintiff undergo an MRI and instructed her to call him two days after the MRI to discuss the results. On April 30, 2009, the MRI was completed. However, it appears that Dr. Jaffrey's opinions

10cv0163

regarding Plaintiff's physical and psychiatric limitations were
written on April 14, 2009.[33]/

Dr. Jaffrey's opinion of Plaintiff's physical limitations
were that she could sit, stand, or walk for zero hours at a time.
However, Dr. Jaffrey contradictorily noted that Plaintiff was able
to sit for two hours, stand for one hour, and walk for one hour out
of an eight-hour workday. Furthermore, several sections of the
opinion incorporated forms with check boxes for various weight
ranges. Dr. Jaffrey checked off boxes corresponding to higher weight
ranges but did not check off boxes for intermediate or lower
ranges. For example, Dr. Jaffrey indicated that Plaintiff could
occasionally carry 6-10 pounds but never greater than 21 pounds. Dr.
Jaffrey did not mark a box for the 0-5 or 11-20 pound categories.
The opinions signed by Drs. Jaffe and Jaffrey are therefore
contradictory and internally inconsistent.

Even if these opinions were not contradictory, they are
clearly controverted by other substantial evidence in the record,
including the opinion of Plaintiff's earlier treating physician, Dr.
Campbell, as discussed supra. The opinions signed by Drs. Jaffe and
Jaffrey are also inconsistent with that given by Dr. Spellman, also
discussed supra.

Dr. Jaffrey also assessed Plaintiff's psychiatric fitness and
recorded his results in Plaintiff's Second MRFC. His reason for
doing so, and his ability to do so accurately, are unclear since his
area of expertise is osteopathic medicine. Three such MRFCs are in
the record; the First MRFC was conducted by Drs. Soliman and Loomis,
and the Third MRFC was conducted by a therapist whose name is

---

[33]/   These opinions are signed by Dr. Jaffrey, not Dr. Jaffe.

10cv0163

1   illegible. Of the twenty categories, the Second MRFC matches the

2   Third MRFC, dated less than a month later, in just six categories.[34/]

3        The opinion of Dr. Jaffe/Jaffrey, Plaintiff's treating

4   physician, as to Plaintiff's physical limitations was internally

5   contradictory and inconsistent with other substantial evidence in

6   the record. Furthermore, the opinion of Dr. Jaffe/Jaffrey as to

7   Plaintiff's psychiatric limitations were inconsistent with other

8   substantial evidence in the record. Therefore, the ALJ did not err

9   in electing not to give controlling weight to these opinions.

10  C. UNKNOWN THERAPIST / DR. ETCHIE

11       On May 6, 2009, a therapist whose name is illegible wrote the

12  above-mentioned Third MRFC. The ALJ apparently believed that this

13  therapist was associated with Dr. Etchie. The therapist noted that

14  he or she had only seen Plaintiff twice, once for 45 minutes and

15  once for 25 minutes. On May 18, 2009, Dr. Etchie, Plaintiff's

16  treating psychiatrist, confirmed Plaintiff's diagnosis of Major

17  Depressive Disorder with Anxiety Features in a letter addressed "To

18  Whom It May Concern".

19       The ALJ noted that Dr. Etchie had only seen Plaintiff twice,

20  once for 45 minutes and once for 25 minutes, and therefore deter-

21  mined that Dr. Etchie had not established the type of physician-

22  patient relationship that would lend special weight to a treating

23  physician's opinion. See 20 C.F.R. §§ 404.1527, 416.927(d)(2)(i)

24  (length of the treatment relationship and the frequency of examina-

25  tion are important factors in determining weight assigned to

26  resulting opinion).

27

28

---

[34/]   The Second MRFC was conducted 20 months after the First MRFC and matches the First MRFC in eleven categories.

10cv0163

1    If the ALJ was correct in assuming that Dr. Etchie and the

2    therapist were associated, the ALJ's determination that no special

3    physician-patient relationship existed between Plaintiff and Dr.

4    Etchie is correct. If the ALJ was incorrect, the determination would

5    apply to the therapist. Furthermore, if the ALJ was incorrect, the

6    lack of any records beyond Dr. Etchie's "To Whom It May Concern"

7    letter clearly indicates that Dr. Etchie also lacked such a

8    physician-patient relationship with Plaintiff.

9    Even if Dr. Etchie or the therapist had established such a

10    relationship with Plaintiff, the opinion expressed in the Third MRFC

11    was inconsistent with other substantial evidence in the record. For

12    example, Drs. Soliman and Loomis determined that Plaintiff had

13    essentially no psychiatric limitations preventing her from working,

14    as stated in the First MRFC. (See AR at 280-82). In fact, the Third

15    MRFC only matches the First MRFC in seven of twenty categories.

16    Since Dr. Etchie and the unknown therapist both failed to

17    establish a physician-patient relationship of the type entitling

18    resulting opinions to special weight, the ALJ did not err in

19    electing not to give such weight to their opinions. Furthermore,

20    because the opinion of Dr. Etchie or the unknown therapist as to

21    Plaintiff's psychiatric limitations were inconsistent with other

22    substantial evidence in the record, the ALJ did not err in electing

23    not to give controlling weight to these opinions.

24    D. OPINIONS OF OTHER DOCTORS ARE SUBSTANTIAL EVIDENCE SUPPORTING THE

25    ALJ'S DECISION

26    The ALJ justifiably elected not to give controlling weight to

27    the opinions of either Plaintiff's actual or purported treating

28    physicians. See Holohan, 246 F.3d at 1202. Furthermore, the ALJ

based that election on specific and legitimate reasons developed

10cv0163

from substantial evidence in the record. <u>See</u> <u>id.</u> at 1203. Specifi-
cally, the opinions of Plaintiff's physical limitations signed by
Drs. Jaffe and Jaffrey were controverted by the opinion of Plain-
tiff's earlier treating physician, Dr. Campbell. Furthermore, the
opinions of Dr. Etchie and the unknown therapist were controverted
by the opinions of Drs. Soliman and Loomis.

Since the ALJ had specific and legitimate reasons for his
election and because that election was within the bounds of the
relevant law, the ALJ did not commit legal error as alleged by
Plaintiff.

For the aforementioned reasons, the Court RECOMMENDS
Plaintiff's Motion for Summary Judgment be DENIED and Defendant's
Motion for Summary Judgment be GRANTED.

VI

<u>CONCLUSION AND RECOMMENDATION</u>

After a review of the record in this matter, the undersigned
Magistrate Judge RECOMMENDS that the Plaintiff's Motion for Summary
Judgment be DENIED and Defendant's Motion for Summary Judgment be
GRANTED.

This Report and Recommendation of the undersigned Magistrate
Judge is submitted to the United States District Judge assigned to
this case, pursuant to the provision of 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than <u>September 6, 2011</u>, any party
to this action may file written objections with the Court and serve
a copy on all parties. The document should be captioned "Objections
to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall
be filed with the court and served on all parties no later than
<u>September 20, 2011</u>. The parties are advised that failure to file

10cv0163

1   objections within the specified time may waive the right to raise

2   those objections on appeal of the Court's order. Martinez v. Ylst,

3   951 F.2d 1153 (9th Cir. 1991).

4

5   DATED:  August 16, 2011

6

7

8   _____

9                         Hon. William V. Gallo
                          U.S. Magistrate Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10cv0163